CLERK'S COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

FILED

UNITED STATES DISTRICT COURT
SANTA FE, NEW MEXICO

MAY 1 4 1999

*Robert M. March*
CLERK

LOUIE CARBAJAL, et al.

        Plaintiffs,

vs.

ALBUQUERQUE PUBLIC SCHOOL DISTRICT,

        Defendant,

vs.

DEBORAH BURCIAGA, et al.

        Defendant-Intervenors and Cross Claimants.

No. CIV 98-279 MV/DJS

ENTERED ON DOCKET
5/14/99

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Intervenors' Motion for Summary Judgment as to Plaintiffs Carbajal, Nessle, Doak, Hall, Eswonia, Jaramillo, Mallow, and Gonzalez-Carver, filed February 26, 1999 **[Doc. No. 79]**, Defendant's Motion for Summary Judgment as to Count Five of Plaintiffs' Amended Complaint and the Constitutionality of the New Mexico Bilingual Multicultural Education Act, filed February 26, 1999 **[Doc. No. 83]**, Defendant's Motion to Dismiss Count VI, filed February 26, 1999 **[Doc. No. 89]**, Defendant's Motion for Summary Judgment as to Plaintiffs' Claims for Violations of Title VI, Title VI Implementing Regulations, the Equal Educational Opportunities Act, and the Fourteenth Amendment to the U.S. Constitution, filed February 26, 1999 **[Doc. No. 93]**, and Defendant's Motion for Summary Judgment as to Plaintiff's Claim for Breach of Contract, filed February 26, 1999 **[Doc. No. 104]**. The Court, having considered the pleadings,



being improperly placed in the program they were denied, because of their national origin, the equal educational opportunities offered to similarly situated Anglo or English-speaking students within APS. Plaintiffs Jessica Nessle, George Doak, Matthew Doak, and Jacob Mallow, of Anglo ethnicity, do not claim national origin discrimination but allege violations of their rights to enjoy equal educational opportunities. In addition, George Doak states that APS retaliated against him for participating in this litigation, and Matthew Doak claims that APS retaliated against him when his parents successfully requested his transfer out of the bilingual education program.

In the LEP category, Plaintiffs maintain that although their first language is Spanish, neither they nor their parents have been given an opportunity to forego the bilingual education program. Plaintiffs Araceli Galindo, Omar Galindo, Jander Galindo, Sara Aranda, and Leticia Aranda all claim that APS has failed to teach them English and has denied them educational opportunities because of their national origin. Lizet and Maria Aranda allege that they have been improperly classified as special education students because APS has tested them only in English. Plaintiff Hector Moreno, who states he dropped out of Highland High School due to his English language difficulties and the school's failure to meet them, alleges that APS refused his request to be placed in English-only courses, resulting in his being denied equal educational opportunities, and that APS has retaliated against him for participating in this litigation. In addition to bringing national origin discrimination claims, Lizet Aranda claims, like George Doak and Hector Moreno, that APS retaliated against her for being a plaintiff in this case.

Finally, Plaintiff Melda Eswonia, a Native American whose primary language is English but whose home language is Apache, states that she was improperly placed in the LEP program, also to the detriment of her educational opportunities.

3

The individual counts of the complaint allege violations of both federal and state law. In Count I of their complaint, Plaintiffs allege that the collective actions of APS are in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. Plaintiffs also challenge the New Mexico Bilingual Multicultural Education Act, N.M. Stat. Ann. § 22-23-1 (Michie 1998), as improperly creating, because of national origin, different treatment of Hispanic students. Plaintiffs contend that in implementing its LEP program pursuant to federal and state law, APS has chosen to segregate Hispanic LEP students from other LEP students despite the availability of alternative programs which are no more costly and which meet the needs of all LEP students in a non-segregated environment. In Count II, Plaintiffs claim that APS has violated Title VI regulations implemented by the Department of Education found at 34 C.F.R. Part 100. Count III maintains that APS's actions violate the Fourteenth Amendment's Equal Protection Clause. Count IV alleges violations of the Equal Educational Opportunities Act of 1974, 20 U.S.C. § 1701. Count V looks to the New Mexico Constitution and alleges violations of Article XII, Section 10. Count VI claims violations of the Elementary and Secondary Education Act of 1965, as amended, 20 U.S.C. § 6301. Count VII addresses alleged retaliation taken against Plaintiffs Hector Moreno, Lizet Aranda, and George Doak, in violation of Title VI and its implementing regulations. Finally, Count VIII alleges a breach of the 1995 OCR agreement. Plaintiffs contend that as third-party beneficiaries of that agreement they have standing to bring this count. The relief requested includes declaratory judgment, injunctive relief, and an award of damages for breach of contract and retaliation.

The Court has allowed intervention. Defendant-intervenors Deborah Burciaga, Roberto Roibal, Elma Villanueva, Jason Gauna, Edward Farquhar, Martha Loya, Felipe Martinez, and Guadalupe Rojas are parents of children who attend APS schools and benefit educationally and

socially from the bilingual program. All of those individuals would like to see the program continued, and some allege that it is deficient in certain areas. The Albuquerque Border City Project ("ABC Project"), the American G.I. Forum of New Mexico ("G.I. Forum"), the League of United Latin American Citizens ("LULAC"), the South West Organizing Project ("SWOP"), and Promotores de Derechos ("Promotores") are all non-profit organizations who have an interest in preserving and furthering the bilingual education program in New Mexico schools.

Intervenors have brought cross claims. Like Plaintiffs, Intervenors state that OCR conducted a compliance review of the APS bilingual education program. Intervenors allege that this review, concluding that APS discriminated against minority students who were not proficient in English, culminated in the 1995 corrective agreement with which APS to date has not fully complied. In addition to alleging improper use of funds, Intervenors claim that decisions affecting LEP students are frequently based on staff preferences rather than the needs of those students. Intervenors also claim that some schools within APS are without a bilingual program, but that where those programs exist some place heavy emphasis on English-as-a-Second-Language classes to the detriment of substantive offerings which should be available to the students, thus depriving them of equal educational opportunities.

Intervenors' claims for relief substantially reflect the counts Plaintiffs have brought. In their first claim for relief, Intervenors allege violations of the Equal Educational Opportunities Act, 20 U.S.C. § 1703(f). Their second and third claims respectively allege violations of Title VI and its implementing regulations. The fourth claim is for violations of Title I, while the fifth and sixth claims aver violations of the United States and New Mexico Constitutions. Lastly, Intervenors' seventh claim alleges that APS has failed to comply with the mandates of New Mexico's Bilingual

Multicultural Education Act. Intervenors seek declaratory and injunctive relief as well as their costs and attorney fees.

## Discussion

I.  The Motions for Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). Under this standard, the moving party initially carries the burden of pointing out to the trial court that there is an absence of evidence to support the nonmoving party's case, although the moving party "need not affirmatively negate the nonmovant's claim in order to obtain summary judgment." *Allen v. Muskogee, Oklahoma*, 119 F.3d 837, 840 (10th Cir. 1997), *cert. denied*, 118 S.Ct. 1165 (1998), *citing Celotex v. Catrett*, 477 U.S. 317, 322-23, 325 (1986). The Court examines the factual record and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Allen*, 119 F.3d at 839-40. Materiality of facts in dispute, if any, is dependent upon the substantive law. *Id.* at 839, *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the movant has met this burden, Rule 56 requires the nonmovant to go beyond the pleadings and show, through affidavits, depositions, answers to interrogatories, and the like that there is a genuine issue for trial. *Allen*, 119 F.3d at 841, *citing Celotex*, 477 U.S. at 324; *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1988). Conclusory allegations are not enough, *see Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-72 (10th Cir. 1998), but summary judgment "is warranted only if the uncontroverted

material facts establish that the moving party is entitled to judgment as a matter of law." *David v. City and County of Denver*, 101 F.3d 1344, 1355 (10th Cir. 1996), *cert. denied*, 118 S.Ct. 157 (1997).

### A.  Intervenors' Motion for Summary Judgment as to Plaintiffs Carbajal, Nessle, Doak, Hall, Eswonia, Jaramillo, Mallow, and Gonzales-Carver [Doc. No. 79]

In this motion Intervenors bring three broad claims. First, Intervenors allege that Plaintiffs Carbajal, Nessle, Doak, Hall, Eswonia, Jaramillo, Mallow, and Gonzales-Carver lack standing to assert certain claims or have not shown the necessary factual support for those claims. Next, Intervenors move for summary judgment on the claims of Plaintiffs Moreno, Galindo, and Aranda with respect to the legality and constitutionality of the New Mexico Bilingual Multicultural Education Act. Finally, Intervenors allege that because Jessica Nessle and Hector Moreno are no longer enrolled in APS schools the Court should dismiss their claims as moot. The Court addresses the claims of LEP students in addressing other motions. Therefore, only these arguments as they relate to the non-LEP students will be considered in this section.

The Plaintiffs named in this motion differ slightly from the Plaintiffs now appearing in the second amended complaint. It is apparent, however, that Intervenors intend this motion to address those Plaintiffs whose children are in the non-LEP category, that is, children who while speaking English as their first language were allegedly wrongfully placed in a bilingual program geared towards the educational needs of Spanish-speaking children.[1]

---

[1] Plaintiffs have listed Melda Eswonia in the LEP category, stating that she may have been placed there. Because Plaintiffs also allege that Ms. Eswonia speaks English as a first language, however, and because Plaintiff

The facts the parties bring to light in this motion are dispositive of most claims non-LEP students have brought. Intervenors explain, supported by Plaintiffs' own deposition testimony, that all students participate in the multicultural education component of the bilingual education program of which non-LEP students complain. Indeed, Mrs. Doak in her deposition stated that she objected to the cultural component of bilingual education, which is given to all children. Mr. Nessle also testified that all students in his daughter's school were required to attend the bilingual program. Mrs. Carbajal acknowledged that no matter what ethnicity students are, they are compelled to attend the bilingual program, that is, a program where all classes are taught in English but where a Spanish teacher would come into a classroom a few times a week to teach Spanish. Mrs. Eswonia testified that all students at Truman Middle School are required to take a Spanish class.

Plaintiffs do not dispute that all students are required to take part in the multicultural component of the bilingual education program. Rather, Plaintiffs argue that as parents, they should have a choice to opt out of the program.[2] Plaintiffs also contend that the multicultural component is nothing more than a guise on the part of APS to obtain State funding earmarked for bilingual education. Curriculum disputes and disagreements about the funding mechanisms for APS schools, however, do not in this case give rise to the constitutional, statutory, and administrative violations Plaintiffs have asserted, nor do they give Plaintiffs standing to bring these claims in this Court.

Under the present facts the inquiry into standing and the inquiry into violations of substantive law merge. While "[t]he irreducible constitutional minimum of standing contains three elements,"

Frieda Eswonia testified that all of Melda's classes, save for one Spanish class, were in English, the Court places her in the same category as the non-LEP students.

[2] Deposition testimony from parents stating that they think Spanish education desirable underscores that the primary issue facing the Court with respect to the non-LEP students is choice.

*Lujan v. Defenders of Wildlife* 504 U.S. 555, 560 (1992), the Court need only go as far as the first: to meet standing requirements a plaintiff must establish "an invasion of a legally protected interest." *Id.* Similarly, to obtain redress for violations of the Equal Protection Clause, Title VI, or Title VI's implementing regulations, Plaintiffs must show that APS has acted in derogation of those provisions.

Both disparate treatment and disparate impact standards apply to the Equal Protection, Title VI, Equal Educational Opportunities Act, and administrative claims Plaintiffs have brought. A party asserting a violation of the Equal Protection Clause of the Fourteenth Amendment must show intent to discriminate. *Washington v. Davis*, 426 U.S. 229, 238-41 (1976). Likewise, a plaintiff claiming discrimination under Title VI faces the same requirements and must "assert and prove that the governmental actor, in adopting or employing the challenged practice or undertaking the challenged action, *intended* to treat similarly situated persons differently on the basis of race." *Castañeda v. Pickard*, 648 F.2d 989, 1000 (5th Cir. Unit A 1981) (emphasis in original). The Equal Educational Opportunities Act, 20 U.S.C. § 1701, also addresses only intentional discrimination. "[T]he discriminatory conduct proscribed by [the act] is coextensive with that prohibited by the fourteenth amendment and Title VI and does not encompass conduct which might violate Title VII because, although not motivated by racial factors, it has a disparate impact upon persons of different races." *Castañeda*, 648 F.2d at 1000-01. Under the Title VI regulations of the Department of Education's Office of Civil Rights, however, a showing of disparate impact is sufficient. 34 C.F.R. § 100.3(b)(2) prohibits actions on the part of a recipient of Federal financial assistance "which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of substantially impairing accomplishments of the objectives of the [aid] program as respect individuals of a particular race, color, or national origin." *Id.*; *see also Alexander v. Choate*, 469

9

U.S. 287, 292-93 (1985). Under any of those standards the Court is compelled to grant summary judgment on the Equal Protection and Title VI statutory and administrative claims.

Intervenors have met their burden of showing an absence of evidence to support those claims. Through deposition testimony, Intervenors have pointed out that for non-LEP Plaintiffs, all students, regardless of ethnicity, participate in the very multicultural education program of which Plaintiffs complain. Plaintiffs have not refuted this evidence. Faced with Intervenors' compelling evidence of lack of discriminatory intent or impact, Plaintiffs have only asserted that they should be given a choice in having their non-LEP students participate in the cultural component of bilingual education at APS schools. Plaintiffs have not shown that there is a genuine issue for trial on the Equal Protection, Title VI, and administrative claims.

Because they can not show different treatment in this program of non-LEP students, Plaintiffs' claims of unequal treatment and unequal educational opportunity under the Equal Educational Opportunities Act, 20 U.S.C. § 1701, or the New Mexico Constitution and statutes must also fail.

Despite substantially holding in favor of Intervenors, the Court clarifies that it does not grant this motion completely. The Court disagrees with Intervenors' contention that all of Hector Moreno's claims are moot. Plaintiffs alleged in their complaint that Mr. Moreno was a twelfth grade student when he dropped out of school. Mr. Moreno has also sought, without success, to return to school to be placed in English-only courses, so that he can improve his English proficiency. Intervenors now argue, citing *Bauchman v. West High School*, 132 F.3d 542 (10th Cir. 1997), *cert. denied*, 118 S.Ct. 2370 (1998), that Mr. Moreno's claims are moot by virtue of his not being enrolled. What prompted a finding of mootness in *Bauchman*, however, was the plaintiff's

graduation from high school. *Id.* at 548. In this instance there is no allegation that Mr. Moreno has graduated, and Intervenors have not shown that Mr. Moreno could no longer attend Albuquerque Public Schools because of some other reason. In addition, Mr. Moreno has brought a retaliation claim against APS which none of the motions now before the Court address. There is no basis, therefore, for dismissing his claims as moot. The retaliation claims for Plaintiffs George Doak, Matthew Doak, and Lizet Aranda also are still before the Court, since they were not included in the scope of Intervenors' motion.[3]

Finally, the ruling on this motion contains no disposition of Intervenors' claims that the Court should dismiss Plaintiffs Aranda, Galindo, and Moreno, who are all LEP students, and Plaintiffs' claims for those students that involve New Mexico's Bilingual Multicultural Education Act. The Court addresses these points elsewhere in this opinion.

**B.** **The motions for summary judgment addressing the Bilingual Multicultural Education Act, the constitutional provisions, Title VI statutory and administrative claims, and the Equal Educational Opportunities Act [Doc Nos. 83 and 93]**

**Undisputed Material Facts**

For the purpose of deciding these motions, the Court finds that the following are the

---

[3] Although Matthew Doak was not included in the Complaint's retaliation count, Plaintiffs allege that APS retaliated against him when his parents removed him from the multicultural component of the bilingual education program. Specifically, Plaintiffs assert that Matthew, because he did not participate in the classroom instruction of that component, was forced to sit in his school's library during the bilingual education period. As a result of the Court's ruling on the present motion it is doubtful that any viable retaliation claims remain with respect to Matthew Doak. Nevertheless, none of the motions now before the Court address this point.

undisputed facts, as disclosed by the record:[4]

1.  In 1994, the United States Department of Education Office for Civil Rights ("OCR"), reviewed APS's programs for language-minority students. OCR concluded that APS's program did not meet constitutional and federal standards.

2.  As a result, APS entered an Agreement for Corrective Action with OCR on September 7, 1995, establishing new procedures for identifying and serving students with limited English language skills.

3.  Pursuant to the Agreement for Corrective Action, APS uses a "home language survey" to identity students who potentially have special language needs. The survey asks the following six questions: "(1) What language does your child speak most of the time? (2) What was your child's first language? (3) What languages, other than those learned only at school, does your child speak? (4) What languages, other than those learned only at school, does your child understand? (5) What languages are spoken in your home? (6) What languages, other than English, are spoken by anyone in your family?"

4.  With the exception of the last question, OCR has specifically approved all of these questions.

5.  If the answer to any of these six questions is a language other than English, the student is classified as one having a primary or home language other than English ("PHLOTE" students).

---

[4] The Court accepts as undisputed all facts admitted by both parties and all facts for which no competent contrary evidence has been presented by the opposing party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Mere assertions that a fact is or is not controverted are insufficient. *Id.*

6. In addition, a student may be identified as a PHLOTE student based on criteria observed by the teachers and staff. The reason for this "observation based" classification is that not all families complete and return the home survey. The OCR identified the following factors for teachers to consider in making this assessment: (1) speaking with peers in another language; (2) responding to another language when used in the classroom; and (3) parents' use of another language. The OCR specifically counsels against identifying a student as PHLOTE "solely on the basis of surname, apparent ethnicity, or other factors not directly related to observed indicators of language use or background."

7. All PHLOTE students are tested for English proficiency using a standardized test, the Language Assessment Scale ("LAS").

8. There are two parts to the LAS, an oral exam and a written exam. The oral exam is scored on a scale of 1 to 5 while the written exam is scored on a scale of 1 to 3.

9. According to CTB McGraw-Hill, the publisher and marketer of the LAS, a student who scores below a 3 on the oral exam should not even be given the written exam. A student who scores a 3 or below on the oral exam is classified as a "limited English Speaker" and instruction in the "home language" is recommended. A student who scores a 4 or a 5 on the oral exam is classified as a "Fluent English Speaker." However, if the student scores only a 1 or 2 on the written portion, demonstrating limited literacy, McGraw-Hill recommends that the student also be given specialized instruction in their home language. Indeed, on one of the publisher's tables explaining scoring, it states: "it is the potentially deceptive [students who score 4 or 5 on the oral exam but 1 or 2 on the written] who have so often been designated as fluent before they are truly ready." Only when a student scores 4 or 5 on the oral exam and 3 on the written exam does McGraw-Hill recommend that

13

a student be mainstreamed as fluent in English.

10.    Pursuant to the Agreement for Corrective Action, APS uses the publisher's guidelines to classify students based on their language abilities as demonstrated on the LAS. Students who score a 1 or 2 on the oral exam are classified as "non-English proficient" ("NEP"). Students who score a 3 on the oral exam or who score 4 or 5 on the oral exam and 1 or 2 on the written exam are classified as "limited English proficient" ("LEP"). Students who score 4 or 5 on the oral exam and 3 on the written exam are classified as "fully English proficient" ("FEP").

11.    Pursuant to the Agreement for Corrective Action, NEP and LEP students are eligible for alternative language services designed to increase their proficiency in English and enable them to have equal educational opportunities as English proficient students.

12.    LEP students attend classes with FEP students throughout the course of the day.

13.    LEP and NEP students are re-tested every two years to re-assess their language proficiency and placement.

14.    As of September 1998, no students had exited APS's bilingual programs as a result of having become English proficient.

15.    Parents always retain the option of removing their child from any bilingual program offered by APS.

16.    APS Carlos Ray Elementary School's Interim Bilingual Education Program Application of February 27, 1998, lists 551 students as PHLOTE and 551 students as NEP or LEP. The number of these students whose primary or home language is Spanish is not identified.

17.    APS Mountain View Elementary School's Interim Bilingual Education Program Application of February 27, 1998, lists 367 students as PHLOTE and 353 students as NEP or LEP.

The number of these students whose primary or home language is Spanish is not identified.

18.   Students who are "culturally and linguistically different" are "counted" for allocating funds under the Bilingual Program. "[C]ulturally and linguistically different" means that the student's home language is other than English.

19.   Plaintiffs Araceli Galindo, Omar Galindo, Jander Galindo, Lizet Aranda, Maria Aranda, Sara Aranda, Leticia Aranda, and Hector Moreno are Hispanic and are LEP students.

## Analysis

The LEP Plaintiffs challenge the New Mexico Bilingual Multicultural Education Act ("BMEA") as unconstitutional, both facially and as applied by APS, under the 14th Amendment of the United States Constitution, and under the New Mexico Constitution, Article XII Section 10. The LEP Plaintiffs further assert that the BMEA and APS's bilingual education program violate Title VI, 42 U.S.C. § 2000d, the Title VI implementing regulations, 34 C.F.R. Part 100, and the Equal Educational Opportunities Act of 1974 ("EEOA"), 20 U.S.C. § 1701. All of these claims are based on the assertion that the BMEA and the APS bilingual program discriminate on the basis of national origin.[5] Defendant APS and Intervenors move for summary judgment in their favor, arguing that Plaintiffs lack standing to raise the constitutional arguments; that the BMEA is constitutional, both on its face and as applied; and that the BMEA and the APS program do not violate Title VI, the Title VI regulations or the EEOA.

The Court will first address the question of standing. Finding that Plaintiffs do have standing

[5] The EEOA claim is also based on an assertion that APS's bilingual program does not meet the needs of students with English language problems, as discussed below.

15

to pursue the constitutional arguments raised here, the Court will then address the merits of Plaintiffs' arguments. The Court finds that the BMEA does not create a discriminatory classification in any manner, and therefore on its face does not violate the Equal Protection Clause, the New Mexico Constitution, or any of the cited statutes or regulations. Likewise, the Court finds that the undisputed facts demonstrate that students are placed in language assistance programs solely on the basis of their performance on a standardized language assessment and strictly according to the guidelines of the publisher of the assessment. Because there is no evidence that any student has been improperly classified as an LEP student or improperly placed in a language assistance program, the Court finds that the LEP students have failed to meet their burden of proof in establishing that the APS bilingual program in practice violates either the United States or New Mexico Constitution, or that the program discriminates against LEP students. However, the Court also concludes that it may not grant summary judgment against the LEP Plaintiffs on their claim that, pursuant to 20 U.S.C. § 1703(f), APS has failed to take appropriate actions to overcome those students' language barriers.

### 1. Standing

Defendant APS first asserts that the LEP Plaintiffs lack standing to challenge the constitutionality of the New Mexico BMEA.

The Supreme Court recently summarized the requirements of standing as follows:

> It is by now well settled that "the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact'--an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of. . . . Third, it must be likely, as opposed to merely speculative, that the

injury will be redressed by a favorable decision."

*United States v. Hayes*, 515 U.S. 737, 742-43 (1995), *quoting Lujan*, 504 U.S. at 560-561.

The Court continued,

> [i]n light of these principles, we have repeatedly refused to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power. We have also made clear that it is the burden of the party who seeks the exercise of jurisdiction in his favor, clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.... The rule against generalized grievances applies with as much force in the equal protection context as in any other. . . . [I]f a governmental actor is discriminating on the basis of race, the resulting injury accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct.

*Id.* at 743-44 (citations and quotation marks omitted).

At the same time, the Supreme Court in *Hayes* also observed that the harms caused by racial classification include that "they threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility." *Id.* at 744. The Court then stated that "[a]ny citizen able to demonstrate that he or she, personally, has been injured by that kind of racial classification has standing to challenge the classification in federal court." *Id.* On this basis, the Court held that an individual who lived in a voting district which had been gerrymandered on the basis of race "has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action." *Id.*

In the present case, APS argues that Plaintiffs can not establish any of the elements of standing. Specifically, Defendant claims that Plaintiffs have not been injured, that there is no connection between any potential, hypothetical injury and Defendant's conduct, and that there is no

17

meaningful remedy available to Plaintiffs in this case.

The LEP Plaintiffs have failed to respond to any of these arguments. Plaintiffs' Response to Defendant's Motion for Summary Judgment refers the Court to Plaintiffs' Response to Intervenors' Motion for Summary Judgment on the standing question. However, Plaintiffs' Response to Intervenors' Motion only addresses the standing of the non-LEP students. Thus, Plaintiffs have completely failed to articulate any basis for the standing of the LEP students to challenge the constitutionality of the BMEA. This leaves the Court unduly hampered in attempting to resolve this issue and would itself be grounds for the Court to grant summary judgment in Defendant's favor. *See* D.N.M. LR-Civ. 7.5(b); *Hayes*, 515 U.S. at 743 ("[I]t is the burden of the party who seeks the exercise of jurisdiction in his favor, clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.")

Despite this deficiency, given the importance of the issues raised here the Court has, on its own, reviewed the record and the Complaint to determine if there is evidence before it which would provide the LEP Plaintiffs standing to raise the constitutional challenges pressed here. The crux of the LEP Plaintiffs' constitutional argument is that the BMEA classifies them by national origin, on its face and as applied by APS, and that this classification is discriminatory. Being subject to a discriminatory classification is itself a sufficiently concrete injury to establish standing to raise an equal protection claim, even if the plaintiff has not suffered any tangible harm as a result of the classification. *Hayes*, 515 U.S. at 744. Discriminatory classifications may "stigmatize individuals by reason of their membership in a racial group and [may] incite racial hostility." *Id.* If the plaintiffs in *Hayes* had standing to challenge their placement in a particular voting district as a discriminatory racial classification, then it follows that Plaintiffs here have standing to challenge their placement

18

in a particular class or "track" at school as discriminatory, even if they can allege no specific tangible harms as a result of that placement. *Id.*; *see also Brown v. Board of Education*, 347 U.S. 483 (1954). Further, the harm alleged here by the LEP Plaintiffs is a direct result of Defendant APS's actions and could be remedied by an appropriately fashioned order of this Court.

Accordingly, despite the failure of Plaintiffs to present any argument on this issue, the Court finds that the record supports the conclusion that the LEP Plaintiffs do have standing to raise the constitutional challenges pressed here. The Court thus turns to the merits of those challenges.

### 2. Equal Protection Claims

Plaintiffs claim that they have been discriminated against on the basis of national origin by virtue of their classification as LEP students and their placement in language assistance classes.

The Fourteenth Amendment of the United States Constitution provides, in relevant part, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV. The Equal Protection Clause prohibits state action which intentionally discriminates on the basis of race or national origin. *Washington v. Davis*, 426 U.S. at 239; *Villanueva v. Carere*, 85 F.3d 481, 485 (10th Cir. 1996) ("Proof of racially discriminatory intent or purpose is required to demonstrate a race-based violation of the Equal Protection Clause."). However, "[n]o inquiry into legislative purpose is necessary when the racial classification appears on the face of the statute." *Shaw v. Reno*, 509 U.S. 630, 642 (1993). In addition, "[a] statute, otherwise neutral on its face, must not be applied so as invidiously to discriminate on the basis of race. *Washington*, 426 U.S. at 239; *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). Plaintiffs here assert both a facial challenge to the BMEA and an as-applied challenge to the APS bilingual program

19

under the statute.

a. **Facial Challenge**

In assessing Plaintiffs' facial challenge to the BMEA, the Court must begin its "review with the venerable presumption that the acts of a state legislature are constitutional." *Villanueva*, 85 F.3d at 487, *citing Parham v. Hughes*, 441 U.S. 347, 351 (1979). Moreover,

> courts pay particular deference to the states in decisions involving the most persistent and difficult questions of educational policy because our lack of specialized knowledge and experience counsels against premature interference with the informed judgments made at the state and local levels. The very complexity of the problems of financing and managing a statewide public school system suggests that there will be more than one constitutionally permissible method of solving them, and that, within the limits of rationality, the legislature's efforts to tackle the problems should be entitled to respect.

*Villanueva*, 85 F.3d at 487, *quoting San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) (citations and quotation marks omitted).

"Such deference is abandoned, though, when a legislative act either disadvantages a 'suspect class' or impinges upon the exercise of a 'fundamental right.' *Villanueva* at 488, *citing Plyler v. Doe*, 457 U.S. 202, 216-17(1982).

However, if a statute does not create a classification between individuals which disadvantages one group or infringes on the fundamental rights of some individuals, then the equal protection clause can not be violated in any manner. *Id.* "The equal protection guarantee of the Fourteenth Amendment only applies to governmental actions which classify individuals for different benefits or burdens under the law; it does not govern actions which do not classify individuals." *James v. City of Chester*, 852 F. Supp. 1288, 1297 (D. S.C. 1994). Specifically, equal protection

20

does not prohibit merely the use of race based terms or terms linked to ethnicity in state laws; it only prohibits unequal treatment of individuals by state laws which use discriminatory classifications to distribute rights or resources. *See Villanueva*, 85 F.3d at 487.

Thus, the Tenth Circuit has upheld a Colorado education statute in the face of an equal protection challenge, holding that the law "simply does not create any classification of students, and therefore it can not create a suspect classification." *Id.* at 488. The law at issue provided for the establishment of charter schools and required that thirteen of these schools be "designed to increase the educational opportunities of at-risk pupils." The plaintiffs had argued that "at-risk," as defined in the statute, was a euphemism for racial and ethnic minorities. The Tenth Circuit held that even if this were true it was insufficient to state a constitutional claim since the law did not create any classification based on the definition. Rather, the statute specifically provided that enrollment in any school must be open to any child and that enrollment decisions must be made in a nondiscriminatory manner. *Id.* Nothing in the statute provided that any benefits or burdens were to be distributed differently among "at-risk" and "non-at-risk" students. The court concluded, therefore, that because the statute created no classification system at all, it did not create a suspect classification.

Turning to the claim at issue here, the purpose of the Bilingual Multicultural Education Act is stated as follows:

> A. The purpose of the Bilingual Multicultural Education Act is to insure equal education opportunities for students in New Mexico.
> B. Cognitive and affective development of the students in New Mexico is encouraged by:
>
> > (1) utilizing the cultural and linguistic backgrounds of the students in the curriculum;
> >
> > (2) providing students with opportunities to expand

21

> their conceptual and linguistic abilities and potentials
> in a successful and positive manner; and
>
> (3) teaching students to appreciate the value and
> beauty of different languages and cultures.

N.M. Stat. Ann. 1978 § 22-23-3 (Michie 1998).

The Act furnishes state financial support for bilingual education programs which, in relevant part:

> (1) provide for the educational needs of linguistically and culturally
> different students, including native American children and other
> students who may wish to participate, . . . ;
>
> (3) use two languages as mediums of instruction for any part or all of
> the curriculum of the grade levels within the program;
>
> (4) use teachers who have specialized in elementary or secondary
> education and who have received special training in bilingual
> education conducted through the use of two languages; and
>
> (5) emphasize the history and cultures associated with the students'
> mother tongue.

*Id.* § 22-23-6.

The Act defines "culturally and linguistically different" as "those persons who are of a different cultural background than the majority culture of the state and whose native tongue is of a language other than the language of the majority culture within the state." *Id.* § 22-23-2. Finally, the Act states that bilingual programs "shall be located in the regular public schools of the district. Involvement of students in any programs shall not have the effect of segregating students by ethnic group, color or national origin." *Id.* § 22-23-5.

Plaintiffs object to the following two portions of the BMEA: (1) the requirement that programs "emphasize the history and cultures associated with the students' mother tongue;" and (2) the definition of "culturally and linguistically different" as "those persons . . . whose native tongue

is of a language other than the language of the majority culture within the state." Specifically, Plaintiffs argue that the use of the terms "native tongue" and "mother tongue" is on its face a means of classifying students on the basis of national origin and that this classification system is discriminatory, in violation of the Equal Protection Clause.

As in *Villanueva*, Plaintiffs' argument fails to state a claim for a facial constitutional violation because the statute as written does not impose a discriminatory classification. *See Villanueva*, 85 F.3d at 488. First, the requirement that bilingual programs "emphasize the history and cultures associated with the students' mother tongue" makes no classification whatsoever. This sentence does not distinguish between the "mother tongue" of any of the students. On its face, the statute requires that bilingual programs emphasize the history and cultures associated with the languages spoken by all of the students in the program, whether they speak English, Spanish or Navajo. This provision does not "classify" or place students in any particular categories based on the languages they speak, nor does it even privilege any particular language in the curriculum. The provision merely recognizes that the school curriculum should emphasize the history and culture associated with the languages spoken by all of the students in New Mexico schools, not just the language spoken by the dominant group in the state.

Similarly, the provision which defines "culturally and linguistically different" as "those persons . . . whose native tongue is of a language other than the language of the majority culture within the state," does not create a classification. This section of the statute simply defines a term; it has no independent effect whatsoever. The term is then used in the section establishing the requirements for state funding of bilingual programs, which states that such programs shall "provide for the educational needs of linguistically and culturally different students, including native

23

American children and other students who may wish to participate, . . . ." N.M. Stat. Ann. § 22-23-6. This provision again does not create a classification. Rather, it states who must be accommodated by state bilingual education programs, specifying that such programs must provide for the needs of students whose "native tongue" is not that of the majority, Native American children, and all other children who wish to participate.

Indeed, on its face this statute does not divide the students but unites them: it specifically provides that bilingual educational programs in the state must accommodate everyone, children who speak "minority" languages, Native American children, and all others who wish to participate in the program. Nowhere in the statute is there any requirement that students who speak minority languages must be placed in special classes, or that they should in any manner be treated any differently than other students. On the contrary, the statute provides that the schools must accommodate these students' needs. Further, as with the statute at issue in *Villanueva*, the BMEA specifically prohibits segregation under the Act and states that the purpose of the Act "is to insure equal education opportunities for students in New Mexico." N.M. Stat. Ann. §§ 22-23-3, 22-23-5.

The mere fact that the statute uses a definition which might be correlated with national origin does not itself establish a discriminatory classification, or even a classification at all. *See Villanueva*, 85 F.3d at 488. If this were enough to make out an equal protection violation, then the Americans with Disabilities Act, the Civil Rights Act of 1866 (which provides that all citizens shall enjoy equal rights with white citizens), and countless other statutes which guarantee equal protection would paradoxically be vulnerable to equal protection challenges. While it is true that a discriminatory classification may have intangible harms, as recognized by the Supreme Court, the mere use of race-based terms or terms which may be linked to national origin in a statute does not establish a

24

classification based on those terms. Again, it is only to the extent that laws allocate rights and resources differently among citizens that there is any potential conflict with the Equal Protection Clause. Absent any language in the statute which creates a distinction between the rights of one ethnic group as opposed to another, the statute can not be said to create a discriminatory classification based on national origin. *See Villanueva*, 85 F.3d at 484.[6]

Because the statute makes no classification among students at all, let alone a suspect classification, the only question remaining is "whether the challenged state action rationally furthers a legitimate state purpose." *Id.* at 488 *citing McGinnis v. Royster*, 410 U.S. 263, 270 (1973). As noted above, the stated purpose of the BMEA is "to insure equal education opportunities for students in New Mexico." The Act further states that the

> [c]ognitive and affective development of the students in New Mexico is encouraged by: (1) utilizing the cultural and linguistic backgrounds of the students in the curriculum; (2) providing students with opportunities to expand their conceptual and linguistic abilities and potentials in a successful and positive manner; and (3) teaching students to appreciate the value and beauty of different languages and cultures.

N.M. Stat. Ann. § 22-23-3.

There can be no doubt that insuring equal educational opportunities for students and promoting the "[c]ognitive and affective development of the students in New Mexico" are legitimate state objectives to which the BMEA is rationally related. *See Brown*, 347 U.S. at 493.

Based on the foregoing, the Court finds that Plaintiffs' facial challenge to the BMEA under

---

[6] The Court is of the opinion that its analysis need go no further than this. Having determined that the statute does not create a classification among students, Plaintiffs' equal protection claim must fail. However, the Court observes that the *Villanueva* court undertook a rationality review of the state statute even after concluding that the statute made no classification among students. In keeping with that example, although such an undertaking is not necessary, the Court will in any event complete the rationality review analysis.

the Equal Protection Clause of the 14th Amendment fails as a matter of law.

### b.    As Applied Challenge

Next, Plaintiffs assert that the BMEA is unconstitutional as applied by APS because APS's system for implementing bilingual education classifies students solely on the basis of national origin.

The Court first must note that Plaintiffs' Complaint pleads other grounds for challenging the APS program as applied under the 14th Amendment, as well as the New Mexico Constitution and the federal statutes. Specifically, the Complaint asserts that the APS bilingual education program denies LEP students equal educational opportunities by failing to provide adequate instruction in English and by failing to provide equivalent and sufficient access to instruction in other courses as that provided for English speaking students. The Complaint further pleads that LEP students have been denied equal educational opportunities by being placed in special education on the basis of tests given in English rather than the appropriate languages. These disparities, according to the Complaint, are forms of national origin discrimination.

However, Plaintiffs have failed to pursue any of these arguments in their responses to Defendant's and Intervenors' summary judgment motions. Intervenors and Defendant suggest that Plaintiffs can not prove these claims. Regardless, by failing to press these arguments and by failing to produce any competent evidence in support of these claims in response to the motions for summary judgment, Plaintiffs have failed to carry their burden in opposing summary judgment on these grounds. *Celotex*, 477 U.S. at 324. The Court will therefore disregard these assertions.

The single argument which the LEP Plaintiffs do raise is that the BMEA is unconstitutional as applied by APS because APS uses a "capture and keep" method to increase the number of LEP

26

students and thereby increase the funding it receives under the BMEA. Plaintiffs assert that APS classifies students as LEP who, according to the publisher of the language placement test used by the District, are "Fluent English Speakers," and that the District uses "subjective, observable criteria" to classify other students as LEP, thus increasing its number of LEP students. This, Plaintiffs assert, amounts to national origin discrimination in that it has the effect of placing Hispanic students in "segregated classes," even though they are fully fluent in English, solely on the grounds that they are Hispanic.

The Court need not consider whether this argument is sufficient to state a constitutional violation because the undisputed facts soundly contradict Plaintiffs' assertions. First, the documents which Plaintiffs themselves produced demonstrate that the publisher of the language assessment used by APS in fact recommends special language education programs for exactly those students classified as LEP students by APS. True, the publisher's guidelines provide that an individual who scores a 4 or a 5 on the oral exam is a "Fluent English Speaker;" but, the guidelines also provide that if the student scores a 1 or 2 on the written exam, she should be given special language instruction. Such students are not *fully fluent* and are not *fully proficient in English*, even though they have a high level of English *speaking* ability. Indeed, Plaintiffs provide one document from the publisher which states that "it is the potentially deceptive [students who score 4 or 5 on the oral exam but 1 or 2 on the written] who have so often been designated as fluent before they are truly ready."

The undisputed facts demonstrate that APS uses exactly these guidelines and standards to classify the language abilities of its students. Specifically, only students who score a 4 or 5 on the oral exam and a 3 on the written exam are classified as FEP (fully English Proficient). It is only these students who are to be mainstreamed under the McGraw-Hill guidelines. Thus, APS is following the

27

publisher's guidelines and standards, just as Plaintiffs ask.

Further, contrary to Plaintiffs' assertion, no students are classified as LEP based solely on the "subjective" observations of teachers and staff. Rather, the undisputed facts demonstrate that the teachers' observations are used to identify students whose primary or home language is not English (PHLOTE students). APS then administers the standardized language assessment to these students. There is simply no evidence before the Court that any student has been classified as LEP on any basis other than his or her performance on the standardized language assessment.

In this regard, it is telling that Plaintiffs have failed to produce any evidence that any student, whether named as a plaintiff or not, is or has ever been classified as LEP and placed in a language assistance program despite being fully fluent in English. If Plaintiffs had such evidence, this was the time to produce it. They have not.

The only evidence which Plaintiffs do produce is that two schools, in their Bilingual Program Applications, list the same or almost the same number of PHLOTE students as NEP and LEP students. This, Plaintiffs argue, demonstrates that APS is classifying Hispanic students as LEP solely to increase its funding for bilingual programs.

Plaintiffs' argument requires several speculative leaps to reach this conclusion. First, Plaintiffs ask this Court to assume that all of the students reported on these forms are Spanish speakers. Next, for Plaintiffs' argument to have any weight, the Court must also assume that these figures represent most if not all of the Hispanic students in the schools. Finally, the Court must assume that at least some of these students should be fully proficient in English. Plaintiffs provide no facts to support any of these links in the chain necessary to their argument that APS is intentionally misclassifying students to increase its funding. Absent evidence to support these

claims, the Court can not take the inferential leaps requested here.

The Court thus is left with the undisputed fact that APS classifies students as LEP solely based on their performance on the standardized language assessment. Even if this predictably results in some grouping based on national origin, the uncontradicted evidence demonstrates that the purpose of the classification is to provide for the specialized needs of these students, not to discriminate. Further, courts have upheld ability grouping in schools, even if it has the effect of creating some de facto segregation. *See Serna v. Portales Municipal Schools*, 499 F.2d 1147, 1153-54 (10th Cir. 1974) (approving of education plan to accommodate needs of New Mexico students with limited English skills); *Montgomery v. Starkville Mun. Separate School Dist.*, 854 F.2d 127, 129 (5th Cir. 1988) ("Indeed, in some cases, courts have directed the use of special groups, particularly where concentrated remedial counseling is required to overcome language difficulties."); *Guadalupe Organization Inc. v. Tempe Elementary School Dist. No. 3*, 587 F.2d 1022, 1026 (9th Cir. 1978) (holding that bilingual education is neither required nor prohibited by the Fourteenth Amendment and approving of educational plan to accommodate students with limited English skills).

The Court therefore finds that, on the undisputed facts before it, the BMEA as applied by APS in its bilingual program does not violate the Equal Protection Clause.

## 3. New Mexico Constitution Challenges

The LEP Plaintiffs next challenge the BMEA, facially and as applied by APS, under the New Mexico State Constitution.

The New Mexico Constitution, Article XII, Section 10, provides, in pertinent part,

"[c]hildren of Spanish descent in the state of New Mexico . . . shall never be classed in separate schools, but shall forever enjoy perfect equality with other children in all public schools and educational institutions of the state . . . ." N.M. Const., Art. XII, § 10. New Mexico courts have apparently never interpreted this provision. The parties themselves construe this section solely as prohibiting segregation of Hispanic children in school, either intentionally or in effect. Although more expansive readings of the term "perfect equality" are possible, the Court will limit its analysis to the parties' shared understanding of the scope of the statute.

As noted above, the BMEA does not create any kind of classification, whether based on national origin or any other criteria. Nothing in the statute requires that students be placed in separate schools or even separate classrooms, and the statute even specifically prohibits segregation on the basis of national origin. N.M. Stat. Ann. 1978 § 22-23-5 ("Involvement of students in any programs shall not have the effect of segregating students by ethnic group, color or national origin."). Therefore, the BMEA does not, on its face, violate the New Mexico Constitution.

Moreover, as applied by APS in its bilingual program, Plaintiffs acknowledge that LEP students are not segregated into separate schools and even attend the same classes as all other students for the majority of the day. As noted above, students are placed in the language assistance program solely on the basis of their performance on a standardized test and there is no evidence that any child has been inappropriately classified as an LEP student or placed in language assistance classes. Further, Plaintiffs have provided absolutely no evidence as to the number of Hispanic students in any of the schools who are *not* classified as LEP and who are *not* in language assistance programs. Indeed, the Complaint itself names several Hispanic students who are not classified as LEP students (see discussion above). While it is undisputed that the majority of the LEP students

30

are Hispanic, Plaintiffs have failed to produce any evidence regarding the national origin of the non-LEP students. Plaintiffs have thus simply failed to produce any evidence tending to demonstrate that the APS bilingual program does in practice segregate Hispanic students from non-Hispanic students. Accordingly, the Court holds that the program as applied does not violate the New Mexico Constitution, Article XII, Section 10.

### 4.    Title VI Challenges

The LEP Plaintiffs next claim that the BMEA, on its face and as applied by APS, violates Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-4a. Title VI prohibits "discrimination under any program or activity receiving Federal financial assistance." *Id.* at § 2000d. Title VI only proscribes intentional discrimination and has been interpreted as coextensive with the Equal Protection Clause. *Villanueva*, 85 F.3d at 486; *see also Regents of University of California v. Bakke*, 438 U.S. 265 (1978). Accordingly, the Court finds that Plaintiffs' claims based on Title VI, both facially and as applied, fail for the same reasons as noted in the discussion of Plaintiffs' equal protection claims.

### 5.    Title VI Regulations

The LEP Plaintiffs also assert that the BMEA, facially and as applied by APS, violates the Title VI implementing regulations, 34 C.F.R. Part 100.

The Title VI regulations "prohibit actions that have a disparate impact on groups protected by the act, even in the absence of discriminatory intent." *Villanueva*, 85 F.3d at 486, *citing Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 584 n. 2 (1983). Establishing a disparate

31

impact claim under the Title VI regulations normally involves a statistical comparison of the impact of the program on the allegedly harmed group with a relevant comparison group. *Id.* A disparate impact claim necessarily entails evidence that the allegedly targeted group has in fact been harmed by the policy at issue. *Id.*

To the extent that Plaintiffs challenge the BMEA as facially violative of Title VI, the Court finds that those arguments must fail for the same reasons as noted in the discussion of Plaintiffs' facial challenge under the Equal Protection Clause.

Turning to Plaintiffs' as applied challenge, Plaintiffs have failed to present any evidence of an actual harm suffered by them as a result of the APS program. Plaintiffs' only allegation of harm pressed in their responses to Defendant and Intervenors' motions is that they have been classified as LEP and placed in language assistance programs on the basis of national origin. While this would be a sufficiently meaningful harm, if proven, there is again no evidence before the Court that any student was classified as an LEP student except on the basis of his or her performance on the standardized language assessment. Because Plaintiffs have failed to present any other evidence showing any other remotely negative impact on them caused by APS's bilingual program, Plaintiffs' disparate impact argument must fail. *Villanueva*, 85 F.3d at 486. Plaintiffs' as applied challenge under the Title VI regulations must therefore be dismissed as well.

### 6. Equal Educational Opportunities Act

Finally, Plaintiffs assert facial and as applied challenges against the BMEA and the APS program pursuant to the Equal Educational Opportunities Act, 20 U.S.C. § 1701. The EEOA prohibits a state from denying a student equal educational opportunities to the same extent as the

32

Equal Protection Clause and Title VI. *See* 20 U.S.C. §1703(d); *Castañeda*, 648 F.2d at 1000-01. To the extent that Plaintiffs premise these claims on the same assertions as those raised under the equal protection and Title VI statute and regulations, these claims must fail for the reasons discussed above. Plaintiffs' Count IV, however, in addition to alleging discrimination brings a claim for denial of equal educational opportunities guaranteed by the Act.

Defendant has addressed this claim in its motions. Apart from any claims of discrimination that may be actionable under the Act, APS also asks the Court to grant summary judgment in its favor on whether it has taken appropriate actions to overcome its students' language deficiencies and to make programs accessible to language-minority students. The focus of this argument is the statutory command of 20 U.S.C. § 1703(f), which states that

> [n]o State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by —
> (f) the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs.

APS argues that the Court should grant it summary judgment because it has complied with the requirements of this section.

*Castañeda* is the leading case analyzing this section. *Castañeda*, when faced with a challenge to the sufficiency of a language program, held that § 1703(f) does not incorporate a requirement that a plaintiff show intent to discriminate. *Casteñeda*, 648 F.2d at 1007-08. Rather, §1703(f) simply instructs that "schools are not free to ignore the need of limited English speaking children for language assistance to enable them to participate in the instructional program for [a] district." *Id.* at 1008. Acknowledging that the language of the statute indicates Congress' intent to

33

leave school districts with considerable latitude in choosing the programs and techniques they would use to comply with § 1703(f), and mindful that courts are ill-equipped to develop standards that are the domain of other branches of government, *id.* at 1009, *Castañeda* developed a deferential three-part test to determine whether a language program complies with the statutory commands.

The test developed by the *Castañeda* court allows wide latitude for interpretation of a school district's language program. First, a court must "examine carefully the evidence the record contains concerning the soundness of the educational theory or principles upon which the challenged program is based." *Id.* A court should not be guided by its own educational theories or values, but must instead "ascertain that a school system is pursuing a program informed by an educational theory recognized as sound by some experts in the field or, at least, deemed a legitimate experimental strategy." *Id.*

Second, the court must inquire whether the "programs and practices actually used by a school system are reasonably calculated to implement effectively the educational theory adopted by the school." *Id.* at 1010. Courts must consider whether, "despite the adoption of a promising theory, the system fails to follow through with practices, resources and personnel necessary to transform the theory into reality." *Id.*

Finally, a court must evaluate a program over time. The concern there is that

> [i]f a school's program, although premised on a legitimate educational theory and implemented through the use of adequate techniques, fails, after being employed for a period of time sufficient to give the plan a legitimate trial, to produce results indicating that the language barriers confronting students are actually being overcome, that program may, at that point, no longer constitute appropriate action as far as the school is concerned.

*Id.*

34

Plaintiffs agree that this statute applies only to the LEP students. Those students, whose first language is not English, allege in part that APS has failed to provide programs that are the equivalent of those provided to non-LEP students, and has failed to teach Plaintiffs sufficient English so that they can transition into mainstream classes.

Raising the OCR agreement as a badge of compliance with the *Castañeda* three-part test, Defendant provides a laundry list of actions it has taken to ensure the appropriateness of its language program. While the program may indeed fulfill the statutory requirements the Court concludes, however, that Defendant has not met its burden of showing that there is an absence of evidence that would support Plaintiffs' case and preclude a trial on the issue of § 1703(f) compliance.

APS has not raised a sufficient issue, under a summary judgment posture, that addresses the first prong of the *Castañeda* test. That test first requires a showing that the plan proposed or the actions taken are "informed by an educational theory recognized as sound by some experts in the field or, at least, deemed a legitimate experimental strategy." *Castañeda*, 648 F.2d at 1009. Despite presenting an impressive list of actions taken in its compliance efforts, by not providing deposition or affidavit testimony of experts in the field, APS has left the Court in a vacuum with respect to judging the adequacy of the underlying theories of its bilingual education plan. While the OCR plan may be the equivalent of testimony by educational experts, the Court is without sufficient information to make that determination. As *Castañeda* cautions, courts should not unduly substitute their "educational values and theories for the educational and political decisions reserved to state or local school authorities or the expert knowledge of educators." *Id.* at 1009.

Nor can APS point to the 1995 OCR agreement as being the sole issue in dispute with respect to § 1703(f) compliance and prevail on an argument that it needs more time, under the third prong

35

of the *Castañeda* test, before being asked to defend the adequacy of its language program. As Intervenors point out in their reply brief, the rights of the parents of LEP children to seek federal court relief are not limited by Title VI or its implementing regulations, but rest on an independent statutory basis, the Equal Educational Opportunities Act of 1974. The Act specifically grants a private right of action. 20 U.S.C. § 1706. Defendant APS has had since 1974 to comply with the requirements of the statute. That in 1995 it entered into a compliance agreement with a federal agency does not bar Plaintiffs from independently seeking relief in this forum. Summary judgment does not lie on the issue of whether APS has taken appropriate action to overcome the language barriers of its LEP students that impede equal participation in its instructional programs.

## C. Defendant's Motion for Summary Judgment as to Plaintiffs' Claim for Breach of Contract

APS admits in this motion that it entered into an agreement with OCR in 1995 to remedy what OCR believed to be a number of deficiencies in its delivery of services to LEP students. Pursuant to this agreement, APS undertook a remedial program, involving incremental compliance, to address OCR's concerns. APS explains that full implementation of corrective action is not scheduled to occur until September 30, 2001. APS argues that the agreement does not apply to non-LEP students, that LEP Plaintiffs are not third-party beneficiaries of the agreement, and that even if they are, it is undisputed that APS has so far performed to OCR's satisfaction.

Plaintiffs respond first by disagreeing with Defendant's assertion that the agreement applies only to LEP students. According to Plaintiffs, the agreement is a directive meant to ensure that APS does not wrongly identify and place students in language services. Plaintiffs also maintain that they

36

are third-party beneficiaries of the agreement, under either federal or New Mexico law. Finally, Plaintiffs argue that there is a genuine issue of fact precluding summary judgment as to whether APS has breached the agreement. Plaintiffs' only argument with respect to breach is that APS was required to provide notice of the placement of students in its bilingual program and give parents a choice to opt out, but did not do so.[7]

Intervenors have filed a reply to this motion. Intervenors agree with Defendants that the OCR agreement encompasses only LEP students. However, Intervenors disagree with Defendants' argument that the agreement does not give rise to third-party rights. Instead, Intervenors cite case law not mentioned by either Plaintiffs or Defendant supporting the proposition that LEP students are properly third-party beneficiaries. Intervenors argue that even as beneficiaries of the OCR agreement LEP Plaintiffs may not collect money damages, and only may obtain specific performance. Intervenors, like Defendant, then maintain that the parents of LEP students now clearly have notice of their opt-out choice, and that their children either no longer are or shortly will not be in the bilingual program. Thus, Intervenors argue, the Court should grant summary judgment because specific performance of the opt-out provision will provide no benefit to the affected Plaintiffs.

It is clear that the only Plaintiffs who may be in a position to assert an interest in the OCR agreement are the LEP students. The agreement, specifically undertaken pursuant to Title VI, the Rehabilitation Act, and the Americans with Disabilities Act, is "designed to ensure that all national-

---

[7] Plaintiffs also state that the reason for breach was APS's desire to tap into increased funding available through the bilingual education program. Even disregarding that the Court has already ruled otherwise, it is completely irrelevant. Plaintiffs' burden is to establish that there are genuine issues of material fact as to breach preventing summary judgment. Breach is relevant, not its possible motives.

origin minority limited-English proficient (LEP) students in the [Albuquerque Public School] District who are in need of language assistance services receive such services." Exhibit A to Affidavit of Elizabeth Lawrence. There is, therefore, no merit to Plaintiffs' argument that the OCR agreement is designed in part to ensure that APS does not wrongly identify students as being LEP eligible. The claims of all the non-LEP students which Plaintiffs have identified in their pleadings for this motion are irrelevant to its disposition.

Despite the Complaint's referring only to the 1995 agreement, the Court assumes that the contract alleged to have been breached is not only the OCR agreement but the corrective action plan which APS developed pursuant to that agreement and which OCR approved on November 15, 1996. The 1995 agreement does not contain express opt out provisions, but the 1996 plan does. Plaintiffs have argued in their response that APS is bound by the express provision in the 1996 plan, and APS has not directly refuted that assumption in its reply, arguing instead that any non-compliance now is moot as a result of Plaintiffs' being on actual notice that they may opt out of the program. Intervenors group the agreement and plan together. Like the parties, the Court will assume that the scope of the Complaint encompasses the 1996 plan as well as the 1995 agreement.

As the intended recipients of the corrective action the OCR sought to introduce in APS's bilingual program, LEP students at APS have standing to maintain an action to enforce APS's obligations under the agreement. *Euresti v. Stenner*, 458 F.2d 1115 (10th Cir. 1972), cited by Intervenors, is controlling. The plaintiffs in *Euresti* sought to compel a hospital to provide indigent services, pursuant to federal legislation which authorized the disbursement of funds to build or modernize facilities in return for those services being furnished. *Id.* at 1116-17. The district court held that the plaintiffs had no standing to sue, but the appellate panel, speaking through Mr. Justice

Clark, sitting by designation, disagreed. *Id.* The *Euresti* court reasoned that the contract with the State of Colorado to build a hospital expressly incorporated the federal statutory obligation, and that the disbursement of federal funds was conditioned on the State's obligation to provide assurances of compliance with the federal funding requirements. *Id.* at 1118-19. By "receiving federal funds, [hospitals] obligated themselves to dispense a reasonable amount of free hospital services to those unable to pay." *Id.* at 1119. As the intended beneficiaries of the federal aid under an agreement which specifically incorporated statutory obligations, the plaintiffs in *Euresti* had standing to maintain their action for compliance with that aid's requirements. *Id.*

Here, it is undisputed that APS receives federal funds to allow it to undertake certain programs for the benefit of LEP students. As in *Euresti*, the LEP Plaintiffs, intended recipients of federal aid, benefit from an agreement which seeks to enforce compliance with statutory mandates. As in *Euresti*, therefore, LEP Plaintiffs have standing to maintain an action to enforce the provisions of the OCR agreement.

Despite the existence of a right of LEP parents to enforce the OCR agreement, the Court is compelled to grant summary judgment on the contract count. The sole breach of the agreement that Plaintiffs have alleged in their response to the motion to dismiss is a failure to notify parents of LEP students that they may opt out of the bilingual education program. In resisting summary judgment, Plaintiffs have cited deposition testimony only from Mrs. Aranda and Mr. Galindo that they argue creates a genuine issue of fact with respect to notice.

While the testimony of Mrs. Aranda does show the existence of material facts with respect to notice, her testimony also shows that by the time this lawsuit was filed she was aware of her right to opt out of the bilingual program. Mrs. Aranda testified that she was never informed that she had

39

the option to put her children in the bilingual program, or take them out. Deposition of Amada Aranda I at 44, 74-75 (11/23/1998). That Intervenors characterize this testimony as not relating to the proper time frame of this litigation, *see* Reply of Defendant-Intervenors to Plaintiffs' Response to Motion for Summary Judgment as to Plaintiffs' Breach of Contract Claim at 9, only underscores the dispute that exists with respect to the extent of notice Ms. Aranda received. Mrs. Aranda, however, also testified that she found out that she could opt her children out of the program when she began her participation in this lawsuit. Aranda Deposition at 73-74.

Likewise, it appears that Mr. Galindo became aware during his deposition that he could withdraw his son Jander from the bilingual education program. Deposition of Santiago Galindo at 13 (11/06/1998). Thus, both Mrs. Aranda and Mr. Galindo now have actual notice that they need no longer allow their children to participate in the bilingual education program. Therefore, APS's compliance with notice requirements for these remaining Plaintiffs, for purposes of enforcing the provisions of the OCR agreement, is now moot.

II.     Defendant's Motion to Dismiss Count VI [Doc. No. 89]

In Count VI Plaintiffs have alleged violations of the Elementary and Secondary Education Act of 1965, as amended, 20 U.S.C. § 6301 ("Title I"). Defendant claims, and Plaintiffs do not dispute, that Title I does not expressly create a private right of action. The parties disagree, however, on whether an implied right of action can be found in Title I.

Citing the four factors that *Cort v. Ash*, 422 U.S. 66 (1975), used to determine whether such a right exists, Defendant claims that the Act does not provide for a private right of action, and thus ask the Court to dismiss this count. Plaintiffs counter by looking instead to *Cannon v. University*

40

*of Chicago*, 441 U.S. 677 (1979), stating that *Cannon* showed that courts should focus on the class of persons considered by a statute. Plaintiffs then argue that in this case the class of persons Title I discussed, as well as the statute's legislative history, can only lead to the conclusion that Congress implicitly created a private right of action that they could enforce when it enacted Title I.

Intervenors first urge the Court to rule that Plaintiffs have failed to state a claim for relief under Title I, explaining that the Complaint makes no mention of Plaintiffs' eligibility for Title I benefits. Neither do Plaintiffs claim, according to Intervenors, that APS has violated Title I in a manner that impacts their children. Intervenors then take the middle position with respect to the existence of a private right of action. Intervenors argue that while Title I does allow private action in certain circumstances, no such right exists based on the facts as alleged in this case. Listing not a small number of cases where Plaintiffs have alleged violations of Title I, Intervenors highlight the similarity these cases share: they were brought by persons who could articulate a specific violation of the statute that impacted their children who were eligible to receive Title I benefits. Intervenors claim that Plaintiffs in the case at bar have not made this allegation. Intervenors ask the Court, therefore, to stop short of broadly declaring that no private right of action is implicit in Title I, and hold instead that Plaintiffs have failed to state claims that would support such an implied right from a reading of Title I and its legislative history.

"[G]ranting a motion to dismiss is 'a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice.'" *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1359 (10th Cir. 1989) *quoting Morgan v. City of Rawlins*, 792 F.2d 975, 978 (10th Cir. 1986). A court may not dismiss a cause of action under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim unless

it appears beyond doubt that the plaintiff can prove no set of facts supporting his/her claim that would entitle him/her to relief. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249-50 (1989). In considering a Rule 12(b)(6) motion, the court must assume as true all well-pleaded facts, and must draw all reasonable inferences in favor of the plaintiff. *Housing Auth. of the Kaw Tribe v. City of Ponca City*, 952 F.2d 1183, 1187 (10th Cir. 1991). The issue in reviewing the sufficiency of a complaint is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support his/her claim. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). These deferential rules, however, do not allow the court to assume that a plaintiff "can prove facts that [he/she] has not alleged or that the defendants have violated the.... laws in ways that have not been alleged." *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983).

Contrary to Plaintiffs' suggestions, the Court can not deem the four *Cort* factors as applied in *Cannon* to be decisive in this motion. In *Cannon* the Supreme Court found a right of private action under Title IX based in part on the clear identification of a "class for whose special benefit the statute was enacted." *Cannon*, 441 U.S. at 694. Plaintiffs rely a great deal in their brief on this class identification. However, as *Noe v. Metropolitan Atlanta Rapid Transit Authority*, 644 F.2d 434 (5th Cir. Unit B 1981) lucidly sets out, *Cannon* represented the high water mark for the creation of implied private rights of action, from which the Supreme Court has significantly retreated. *Id.* at 436-37. *Noe* explained that following *Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979) the "task of federal courts in cases such as this was limited *solely* to determining whether Congress intended to create the private right of action being asserted in a given case." *Noe*, 644 F.2d at 436 (emphasis in original). The Tenth Circuit has taken the same approach. *Sonnenfeld v. City and*

*County of Denver*, 100 F.3d 744 (1996), recognized that the *Cort* factors, which *Cannon* applied, have effectively been condensed by subsequent Supreme Court case law into one: "whether Congress, expressly or by implication, intended to create a private cause of action." Id., at 747. Plaintiffs' misplaced reliance on *Cannon*, therefore, does not help them clear the hurdles that this motion presents.

Independent of whether Title I implicitly creates a private right of action, the Court must consider Intervenors' argument that Plaintiffs have failed to state a claim upon which relief can be granted. Reduced to its essentials, the gravamen of Plaintiffs' complaint is that certain APS students, some on the basis of national origin discrimination and some on the basis of English language deficiencies, were placed and left in a substandard bilingual program without notice to their parents, thus being deprived of equal educational opportunities. It is these allegations that the Court must address in determining whether Plaintiffs have stated a claim for relief under Title I.

The central focus of Title I is to help children overcome the barriers created by disadvantage, with particular emphasis on high-poverty children and children from low-income families. *See* 20 U.S.C. § 6301. Children with limited English proficiency are not independently included in the scope of the Act, *id.* § 6301(b)(3), but rather are cited in its statement of policy in the context of economic disadvantage. *Id.* Moreover, as Intervenors point out, funding allocation under Title I generally is reserved for areas where there exists a certain minimum number of low-income families. *Id.* §§ 6313, 6314, 6315.

Plaintiffs have failed to state a claim on which relief can be granted under Count VI. Plaintiffs have alleged that they are beneficiaries of funds being distributed to APS. Plaintiffs have not claimed, however, that they are economically disadvantaged so as to be eligible for Title I

43

benefits, or that the actions of APS deprive them of those benefits. None of the Plaintiffs has stated that he or she is from a low income family. None has averred that the children named participate in a Title I program.[8] In addition, Plaintiffs have not alleged a connection between Title I funding as it broadly applies to APS and their claims now pending before the Court. Plaintiffs have not denied Intervenors' allegations that although APS receives Title I funding, none of that funding goes to the non-LEP bilingual programs. In sum, Plaintiffs have not alleged a sufficient connection between their grievances and Title I to let their claim in Count VI survive even the permissive standard of a motion to dismiss.

THEREFORE,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment as to Count Five of Plaintiffs' Amended Complaint and the Constitutionality of the New Mexico Bilingual Multicultural Education Act, filed February 26, 1999 **[Doc. No. 83]**, Defendant's Motion to Dismiss Count VI, filed February 26, 1999 **[Doc. No. 89]**, and Defendant's Motion for Summary Judgment as to Plaintiff's Claim for Breach of Contract, filed February 26, 1999 **[Doc. No. 104]** be, and hereby are, **granted**.

IT IS FURTHER ORDERED that Intervenors' Motion for Summary Judgment as to Plaintiffs Carbajal, Nessle, Doak, Hall, Eswonia, Jaramillo, Mallow, and Gonzalez-Carver, filed February 26, 1999 **[Doc. No. 79]**, and Defendant's Motion for Summary Judgment as to Plaintiffs' Claims for Violations of Title VI, Title VI Implementing Regulations, the Equal Educational

---

[8] Deposition testimony from APS Cross Cultural Unit Director Virginia Duran-Ginn indicates that the APS Title I program serves limited English proficient students. Intervenors' Memorandum in Support of Their Motion for Summary Judgment as to Plaintiffs Carbajal, Nessle, Doak, Hall, Eswonia, Jaramillo, Mallow, and Gonzales-Carver at 23. Even for the LEP students, however, Plaintiffs have not alleged their participation in a Title I program.

Opportunities Act, and the Fourteenth Amendment to the U.S. Constitution, filed February 26, 1999

**[Doc. No. 93]** be, and hereby are, **granted in part.**

_____
MARTHA VÁZQUEZ
U. S. DISTRICT JUDGE