# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

LOUIE CARBAJAL, et al.

     Plaintiffs,

vs.                               No. CIV 98-279 MV/DJS

ALBUQUERQUE PUBLIC SCHOOL DISTRICT,

     Defendant,

vs.

DEBORAH BURCIAGA, et al.

     Defendant-Intervenors
     and Cross Claimants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS MATTER** is before the Court for a bench trial upon Plaintiffs' Memorandum in Support of Judgment for Plaintiffs on Count IV Based on Stipulated Facts, filed August 26, 1999 **[Doc. No. 155]**. The Court having considered the pleadings, stipulated facts, stipulated exhibits, relevant law, and being otherwise fully informed, finds that Plaintiffs have not met their burden of proving a violation of the Equal Educational Opportunities Act ("EEOA"), 20 U.S.C. § 1701 *et seq.*

## BACKGROUND

This case involves the provision of bilingual education to students attending Defendant Albuquerque Public Schools ("APS"). The Court will briefly outline the proceedings in the case to date; a more complete discussion of the case background and claims can be found in the Court's Memorandum Opinion and Order of May 14, 1999.

Plaintiffs are parents of current and former APS students some of whom are limited-English-proficient ("LEP") and some of whom are English-proficient. In their Second Amended Complaint, Plaintiffs claim that APS violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; the Equal Protection Clause of the United States Constitution; the EEOA; the New Mexico Constitution; and the Elementary and Secondary Education Act of 1965, as amended, 20 U.S.C. § 6301. Moreover, Plaintiffs complain that Defendant retaliated against some Plaintiffs for their participation in this suit and breached an agreement made between the United States Department of Education's Office of Civil Rights and APS in 1995 ("OCR Agreement") to remedy certain deficiencies of the bilingual program. Intervenors are parents of APS students who have benefitted from APS's bilingual program and non-profit organizations with an interest in promoting bilingual education programs. Intervenors brought several cross claims against APS, all of which have been settled by joint agreement of Intervenors and Defendant APS and are therefore no longer before this Court. *Settlement Agreement and Release of Claims*, June 18, 1999.

Most of Plaintiffs' claims are also no longer pending. On May 14, 1999, the Court issued a Memorandum Opinion and Order, granting in whole or in part several motions for summary judgment and a motion to dismiss. Remaining are the Plaintiffs' EEOA claim and the claim of alleged retaliation in violation of Title VI regulations, 34 C.F.R. Part 100. The parties have agreed to a trial on the merits on the EEOA claim based on stipulated facts, stipulated exhibits, and trial briefs. This claim is brought by Lizet Aranda, Maria Aranda, Sara Aranda, Leticia Aranda, Hector Moreno, Araceli Galindo, Omar Galindo, and Jander Galindo – LEP Plaintiffs (hereinafter "Plaintiffs").

Plaintiffs allege that APS has historically and continues to violate civil rights standards in implementing its program for LEP students – Alternative Language Services ("ALS"). Conceding

that the program is based on a valid educational theory and is being implemented in accordance with that theory, the crux of Plaintiffs' EEOA claim is that APS has not produced satisfactory results in that LEP students are not becoming English-proficient in a timely manner. Plaintiffs focus on APS's lack of test results indicating LEP students' progress in learning English in addition to OCR's determination that APS's program was inadequate. Plaintiffs argue that given APS's history of non-compliance with the EEOA, the Court cannot rationally find that APS will implement a satisfactory program for LEP students. Based on these alleged deficiencies, Plaintiffs urge the Court to enjoin the ALS program in its entirety.

Defendant APS and Intervenors oppose Plaintiffs' claim. They argue that Plaintiffs have not met their burden of showing that APS has violated the EEOA, and that the factual record does not support the extreme remedy sought by Plaintiffs. APS avers that the relief sought is too broad and that Plaintiffs do not have standing to seek relief on behalf of non-parties. Because Plaintiffs' primary objection is the lack of longitudinal data, APS argues that the appropriate remedy is to improve its data collection system, as it is working to do, rather than abolishing its program. APS asserts that the claims of those Plaintiffs who no longer attend APS are moot.[1] Moreover, APS argues that the district has taken appropriate action in helping Plaintiffs overcome their language barriers, reviewing each Plaintiff's academic record in turn. Intervenors contend that it is premature to assess whether APS has achieved satisfactory results until APS has had sufficient time to institute its data collection system. Given that APS has entered into an agreement with OCR to correct the deficiencies in APS's data system, Intervenors argue, APS should be given time to implement the OCR Agreement.

---

[1]The Court does not reach APS's standing arguments and assertion that the claims of the Plaintiffs who are no longer in school are moot because it finds that Plaintiffs have not met their burden of proof.

Moreover, according to Intervenors, the OCR Agreement moots Plaintiffs' claim because it seeks to correct the claimed deficiencies.

Having outlined the parties' contentions, the Court will issue its findings of facts and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

1.   The Albuquerque Municipal School District No. 12, Counties of Bernanlillo and Sandoval, known as "Albuquerque Public Schools" ("APS"), is a local public school district which receives federal funds. Stipulations of Fact ("SOF") ¶1.

2.   In September 1995, APS entered into an "Agreement for Corrective Action" with OCR ("OCR Agreement") and pursuant to this agreement adopted a "Plan for Providing Educational Services to all Limited English Proficient Students" ("OCR Plan") in November 1996.  Section XII of the OCR Plan is entitled "Steps the District Will Take to Evaluate Effectiveness of Alternative Language Services."  It states that APS will evaluate its ALS program on three levels: individual student (called "participant level"), program, and district. The participant level analysis is to include language proficiency of students, rates of exit from ALS, and performance on state- and district-mandated assessments.  The district or system level analysis is to include comparisons between LEP and non-LEP students on a number of criteria, including grades in core curricular areas, scores on standardized assessments, and graduation and dropout rates.  Exhibits 2, A.

3.   When they enroll, all APS students, or their parents, are asked to complete a home language survey which asks about the languages spoken by the student and the family.  The survey is

designed to identify students who have a primary or home language other than English ("PHILOTE" students). These language minority students are potentially eligible for special language development programs. Under the State Funded Bilingual Education Act, one goal of identifying language-minority students is to help communities speaking a language other than English maintain or reclaim their language. SOF ¶¶3-6.

4.    Those identified through the survey as PHILOTE students and other students determined by APS to be unable to speak, read, write or understand English are tested for English using a standardized test, the Language Assessment Scales ("LAS"), which has both oral and reading/writing components. The LAS is widely used as a valid method of assessing English language proficiency. Based on their LAS scores, students are classified as non-English proficient ("NEP"), limited English proficient ("LEP"), or full English proficient ("FEP"). The LAS-Oral ("LAS-O") scores students on a scale from 1 to 5. Students scoring a 4 or 5 are considered FEP. Students scoring a 3 are considered LEP. Students scoring a 2 are assessed as LEP or NEP.[2] Students scoring a 1 are considered NEP. The LAS Reading/Writing ("LAS-RW") scores students on a scale from 1 to 3. A score of 1 indicates that a student is non-literate, 2 indicates limited literacy, and 3 indicates competent literacy. SOF ¶¶7-10; Exhibits 4-6.

5.    Students under the age of seven are given a test called the "pre-LAS" which has only an oral component and uses less complex English than the LAS. The pre-LAS scores students on

---

[2]The stipulated exhibits give conflicting information about those who score a 2 on the LAS-O. According to Table 1, "Interpretation of LAS LPI," in Exhibit 4 those with a score of 2 are NEP. The APS LAS Chart in Exhibit 5 concurs, but the "What do the LAS Scores Mean?" sheet indicates that those scoring a 2 are LEP.

a scale from 1 to 4.  SOF ¶¶8, 39.

6.     Pursuant to NMSA § 22-23-1 *et seq.*, APS has implemented bilingual education programs at 59 of the 123 schools in the district.  Bilingual education programs use two languages so that language minority students are taught for some part of the day in their "home" or "native" language.  APS offers two bilingual models – Transitional Bilingual Education and Maintenance Bilingual Education to meet the needs of NEP and LEP students as part of its plan to deliver services to language minority students. SOF ¶¶2, 11; Exhibit A.

7.     Transitional Bilingual Education ("TBE") provides instruction to LEP/NEP students in their home language with a sliding scale of time and content, phasing students into subject matter taught in English.  SOF ¶13.

8.     Maintenance Bilingual Education ("MBE") is designed to develop both English and the student's home language.  SOF ¶14.

9.     Individual schools decide which alternative language services program model will be implemented at that school.  SOF ¶12.

10.    APS bilingual programs are recognized by at least some experts in the field as based on sound educational theories and sound pedagogical principles.  SOF ¶16

11.    APS has taken and is taking steps to ensure that all LEP/NEP students receive instruction in the core curriculum either through bilingual education or English as a Second Language ("ESL") methodologies which modify the curriculum to make it understandable to LEP/NEP students.  SOF ¶17.

12.    Currently, the progress of students classified as LEP or NEP is monitored using: (1) the LAS at least every two years; (2) standardized achievement tests administered at grades four, six,

and eight; (3) the New Mexico High School Competency Examination, given to all New Mexico students in the tenth grade; and (4) evaluation of scholastic performance by classroom teachers. SOF ¶¶18, 19.

13.    APS maintains a "cumulative file" on each student which typically contains the student's transcript, report card, results of standardized tests, LAS scores, and teacher comments. SOF ¶20

14.    APS is currently developing and implementing a centralized system to monitor and evaluate the progress of students receiving alternative language services. Exit criteria recently have been developed to determine whether students have attained sufficient proficiency in English that they should leave ALS programs. SOF ¶21.

15.    Plaintiffs would not leave APS's bilingual education program unless the students or parents opt out, because the program is designed to maintain and enrich proficiency in the students' home language as well as in English. Students who participate in an MBE program exit from various degrees of English language instruction but not from the ALS program as a whole. For example, a student may move from ESL classes to English Language Development ("ELD") to regular English language arts curriculum as her or his English proficiency improves. SOF ¶22.

16.    APS uses "redesignation criteria" that were recently developed and are being implemented during the 1999-2000 academic year to decide when children should move from one language category to another. SOF ¶24.

17.    The LAS has been the only standardized test used to decide to exit a student from an ALS program. SOF ¶26.

18.   Since 1992, APS has maintained a central computer database known as the Student Information System ("SIS"). It contains information on individual students which includes: name, address, school, ethnicity, parents' names, guardianship status, grades, grade point average, special education information (if applicable), attendance records, enrollment history, and LAS scores (if applicable). SOF ¶27.

19.   APS also maintains a computer database at its office of Research, Development, and Accountability ("RDA database"). The RDA database includes results from state-mandated scholastic achievement tests, including: the Iowa Test of Basic Skills ("ITBS"), Terra Nova, New Mexico Achievement Assessments, and the New Mexico High School Competency Examination. The RDA database also contains the results of the Kindergarten Development Progress Report ("KDPR") – a district-mandated scholastic achievement test. It does not include LAS scores. The RDA database includes data beginning for the 1997-98 school year. SOF ¶29.

20.   The SIS and RDA databases do not contain information regarding when a student has been re-classified as LEP or FEP (based on LAS score) or when a student has exited from a bilingual program. The scholastic achievement test scores in the RDA database have not been compared, in the aggregate, with the LAS scores in the SIS database. Student performance data (retention, graduation and drop-out rates, state and district-mandated assessments) have not been compared, in the aggregate, with LAS scores. SOF ¶33.

21.   The SIS and RDA databases use different application programs written in different computer languages and are in different formats. Currently, the data from the two databases cannot be easily merged to aggregate and disaggregate information. In October 1998, APS began

creating an interface program to link the two databases.  The link will enable APS to merge the data to allow a uniform electronic format to do queries that easily link demographic data sets from SIS with assessment data sets from the RDA database.  SOF ¶30.

22.     In the 1997-98 school year, APS began new procedures to evaluate its ALS program.  It now collects the following student information disaggregated by: (1) student information number, home or native language, English language proficiency level (for all LEP students by year), race/ethnicity, grade level by year, grade retention, instructional program(s) by year, year entered program(s), year exited program(s), gender, and migrant status; (2) list for each class taken: grades, language of instruction, and instructor for each class by year; and (3) direct indicators of student progress by year including standardized and non-standardized test results, language assessment tests, and content subject matter tests and grades.  SOF ¶31.

23.     By September 30, 2001, APS intends to complete a comprehensive system of data collection keyed to individual students which can be cross-referenced by student characteristics, classroom characteristics, school characteristics, and district characteristics.  APS will also design a program evaluation system which includes maintaining a longitudinal database that will allow the district to compare the achievement of all students in a given grade individually, and as a grade cohort for succeeding years.  Achievement will be defined to include academic subject matter and English language acquisition.  In the interim, APS will annually sample LEP student cohorts district-wide for evaluation of student achievement.  SOF ¶32.

24.     APS has not provided a comprehensive evaluation of its bilingual education program's effectiveness from its inception to early 1999.  APS has provided individual assessment reports.  By October 1999, APS will be able to access the SIS and RDA databases, with data

from March 1997, that will allow a comprehensive evaluation based on student performance data collected in the prior two years. Because the LAS is generally given not less than every two years, in October 1999 the SIS database will contain only one LAS score for most students. Because the scholastic achievement tests are given in grades four, six, eight, and ten, in October 1999 the RDA database will contain only one score for most students. SOF ¶36.

25. The New Mexico High School Competency Examination ("NMHSCE") is required of all New Mexico high school students. It is given in English. SOF ¶40.

26. Plaintiff Leticia Aranda uses Spanish as her first language and has been classified as LEP based on her LAS score. She has attended APS since the 1996-97 school year and is currently attending La Mesa Elementary School. She has completed the second grade. In the 1996-97 school year, Leticia Aranda attended the Extended Language Kindergarten; her bilingual program included one-half day in a Spanish literacy class while the other half day included one hour of ELD, in which the instructor conversed in both English and Spanish. In the first semester of 1997-98, Leticia Aranda's program included two hours of Spanish literacy and one hour of ELD per day. In the second semster, her program included one hour of Spanish literacy, one hour of ESL, and one hour of ELD per day. In 1996-97, Leticia Aranda scored a 1 on the pre-LAS, in 1997-98 she scored a 4 on the pre-LAS test, and in 1998-99 she scored a 3 on the LAS-O and a 2 on the LAS-RW. SOF ¶37.

27. Plaintiff Maria Aranda uses Spanish as her first language and has been classified as LEP based on her LAS score. She has attended APS since the 1993-94 school year, attends Hayes Middle School, and has completed the seventh grade. She is eligible for and receives special

education services, having been assessed as having a learning disability.  APS has provided Maria alternative language services, including ESL and native language instruction.  In 1996 Maria Aranda received a 4 on the LAS-O and a 1 on the LAS-RW, in 1997 she received scores of 4 and 1 respectively, and in 1998 scores of 4 and 2 respectively.  SOF ¶38.

28.    Plaintiff Sara Aranda uses Spanish as her first language and has been classified as LEP based on her LAS score.  She has attended APS since 1997-98, attends La Mesa Elementary School, and has completed the first grade.  Sara Aranda attended the Extended Day Kindergarten during the 1997-98 school year.  Her bilingual program included one-half day in Spanish literacy class while the other half day included one hour of ELD.  Her teacher, Valerie Martinez, could converse in both English and Spanish, used English as her core language of instruction, and translated curriculum concepts from English to Spanish approximately thirty to forty percent of the time during the beginning of the year.  By the end of the 1997-98 school year, Ms. Martinez's core instruction was primarily in English and she translated new material or concepts into Spanish approximately ten percent of the time.  In 1998-99, Sara Aranda attended the first grade where her program included one and one-half hours of Spanish literacy instruction and one hour of ESL per day.  Her student evaluations show that she made normal progress in all areas and showed no areas of special need except for "beginning, or needs more time and experience" in distinguishing likenesses and differences in English language arts.  She was evaluated in her Kindergarten Development Progress Report as being at grade level in English language arts and reading.  Sara Aranda scored a 1 on the pre-LAS both in October 1997 and in April 1998.  SOF ¶39; Exhibit E.

29.    Plaintiff Lizet Aranda uses Spanish as her first language and has been classified as FEP based

on her LAS score. She transferred to APS from El Paso, Texas in 1991, and attended several APS schools, including New Futures alternative school in 1998-99. She graduated from APS in 1999. Lizet Aranda was placed in a learning disabled program in Denver in 1990 and she received special education services as specific learning disabled at APS. She attended a combination of special education and regular education classes and received speech and language therapy. APS provided Lizet Aranda alternative language services, including ESL, sheltered content instruction, and native language instruction. In March 1995, her national percentile rank composite score was 4% on the ITBS. In March 1996, she scored a 5 on the LAS-O and a 3 on the LAS-RW. She passed the NMHSCE in February 1997. SOF ¶40; Exhibit F.

30. Plaintiff Jander Galindo uses Spanish as his first language and has been classified as LEP based on his LAS score. He has attended La Mesa Elementary school since kindergarten and has completed the second grade. Jander Galindo spoke no English when he began kindergarten and spoke progressively more English from kindergarten to second grade. In the 1997-98 school year, Jander Galindo scored a 1 on the pre-LAS test and in 1998-99 he scored a 2. APS has provided and is providing Jander Galindo the following alternative language services: ELD and native language academic instruction. In the first grade, he received two hours per day of Spanish literacy and one hour of ELD. In the second grade, he received three hours of instruction in English and three hours of instruction in Spanish per day. SOF ¶41.

31. Plaintiff Araceli Galindo uses Spanish as her first language and has been classified as LEP based on her LAS score. She is a student at Highland High School in the twelfth grade and

has passed the NMHSCE. APS has provided Araceli Galindo the following alternative language services: ESL, ELD, and native language academic instruction. A data report from SIS in September 1997 had no ITBS score for Araceli Galindo, an LAS-O score of 1 and an LAS-RW score of 0. In September 1998, Araceli Galindo scored a 2 on the LAS-O and a 3 on the LAS-RW. SOF ¶42; Exhibit H.

32. Plaintiff Omar Galindo uses Spanish as his first language and has been classified as LEP based on his LAS score. He completed the eighth grade at Hayes Middle School. APS has provided Omar Galindo the following alternative language services: ESL and sheltered content academic instruction. His LAS scores in April 1996 were 1 on the LAS-O and 0 on the LAS-RW. In October 1998, his scores were 3 and 1 respectively. In March 1996, Omar Galindo's national percentile rank composite score on the ITBS was 1%. Omar Galindo has been referred for disciplinary action on numerous occasions while at Hayes Middle School. SOF ¶43; Exhibit I.

33. Plaintiff Hector Moreno uses Spanish as his first language and has been classified as LEP based on his LAS score. He was first enrolled in APS in August 1991. APS has provided Hector Moreno the following alternative language services: ELD, ESL, and native language academic instruction. In both April 1996 and September 1997 he scored a 3 on the LAS-O and a 2 on the LAS-RW. While a student at Highland High School, Hector Moreno passed the NMHSCE. In the fall semester of 1996, Hector Moreno accumulated 132 absences. In 1998, he withdrew from APS and was not prevented from returning to school. SOF ¶44; Exhibit J.

## CONCLUSIONS OF LAW

The EEOA provides in relevant part,

> No State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by —
>> (f) the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs.

20 U.S.C. § 1703. The leading case interpreting this requirement is *Castañeda v. Pickard*, 648 F.2d 989 (5th Cir. 1981). In *Castañeda*, the Fifth Circuit noted that under the EEOA, school districts have substantial discretion in adopting their language remediation program, but that the program must be a good faith effort to remedy language deficiencies. *Id.* at 1008. The court then set out a three-part test to determine whether a program complied with the statutory command "to take appropriate action to overcome language barriers." First, a court must "examine carefully the evidence the record contains concerning the soundness of the educational theory or principles upon which the challenged program is based." *Id.* A court should not be guided by its own educational theories or values, but must instead "ascertain that a school system is pursuing a program informed by an educational theory recognized as sound by some experts in the field or, at least, deemed a legitimate experimental strategy." *Id.*

Second, a court must assess whether the "programs and practices actually used by a school system are reasonably calculated to implement effectively the educational theory adopted by the school. " *Id.* at 1010. Courts must inquire whether, "despite the adoption of a promising theory, the system fails to follow through with practices, resources and personnel necessary to transform the theory into reality." *Id.*

Third, and finally, a court must evaluate whether the program over time has produced

sufficient results.  The *Castañeda* court articulated this prong as follows:

> [i]f  a school's program, although premised on a legitimate educational theory and
> implemented through the use of adequate techniques, fails, after being employed
> for a period of time sufficient to give the plan a legitimate trial, to produce results
> indicating that the language barriers confronting students are actually being
> overcome, that program may, at that point, no longer constitute appropriate action
> as far as the school is concerned.

*Id.*

In this case, Plaintiffs have stipulated that the first two prongs of the *Castañeda* EEOA

test have been satisfied – sound educational theory and program implementation.  SOF ¶¶16, 17;

*Plaintiffs' Memorandum in Support of Judgment*, at 4-5.  They assert, however, that APS has not

"produced results" as required under the third prong.  The parties dispute whether adoption of an

adequate program evaluation system falls under the second or third prong of *Castañeda*.

Intervenors argue that program evaluation is part of the second-prong program implementation,

rather than third-prong production of results, and that it would be premature for the Court to

assess APS's program under the third prong until it has adopted an adequate evaluation program.

Relatedly, Intervenors argue that the OCR Agreement moots Plaintiffs' claim.  Plaintiffs identify

the lack of longitudinal data demonstrating that Plaintiffs have overcome language deficiencies as

evidence that Defendant cannot meet the third prong.  However, Intervenors assert, Defendant is

working to remedy this problem and has entered into an agreement with OCR specifying the type

of testing and data collection system APS must have implemented by September 2001.  See

Exhibit A, the OCR Plan.  Given that APS is working to correct the problem to which Plaintiffs

point, Intervenors contend that enjoining the program is not warranted.

Plaintiffs counter that the second prong of *Castañeda* requires only that the school

implement a program based on an approved educational theory, whereas the third prong addresses whether the program has produced satisfactory results. Moreover, Plaintiffs argue that the OCR agreement is too insignificant to moot their claim. Plaintiffs rely on *Flores v. Arizona*, 48 F.Supp.2d 937, 956 (D.Ariz. 1999), in which the court held that legislative action did not moot an EEOA claim, and that whether the state provided adequate funds for the LEP programs would be decided at trial. The instant case is distinguishable in that the Court has been given this case for decision with a stipulated record before it unlike *Flores* in which the trial and the development of the factual record was yet to come. This case is more akin to *United States v. Texas*, 680 F.2d 356 (5th Cir. 1982), in which the Fifth Circuit, though agreeing with the district court that Texas had failed to meet the needs of LEP students, struck down the injunctive order requiring establishment of bilingual education programs on the basis that it was rendered moot by the enactment of the 1981 Bilingual and Special Language Programs Act which similarly mandated the provision of bilingual education. The Court finds that it would make little sense to enjoin a program without evidence that it is not producing sufficient results and given that APS is working to correct its evaluation and data collection systems.

The Court cannot make a determination whether APS has produced sufficient results pursuant to the EEOA based on the factual record before it. Though APS does not currently have the test results and a data evaluation system in place to assess whether LEP students have made sufficient progress in overcoming their language barriers, the parties disagree about the consequences of this void. Plaintiffs suggest a literal meaning of the requirement to "produce results," asserting that APS does not possess sufficient information showing LEP students' progress and that it therefore cannot deliver or hold forth the required results. APS attempts to

show, based on the plaintiff students' records, that these students have made sufficient results, whereas Intervenors argue that it would be premature for the Court to rule on the EEOA claim until APS is allowed to implement its new assessment tools and data collection system.

As in any civil case, Plaintiffs in this case have the burden of proving their case – that APS violated the EEOA. *See United States v. Texas*, 506 F.Supp. 405, 433 (E.D.Tex. 1981)("[i]f plaintiffs can demonstrate such failure, whether deliberate or unintentional in nature, they are entitled to relief"). Plaintiffs seek to meet their burden by claiming that APS cannot present adequate test results indicating that Plaintiffs have come sufficiently far in meeting their English language barriers, apparently assuming that this absence of data proves their case. Defendant's brief reviews each student plaintiff's file, giving relevant LAS and other test scores and listing those ALS services APS provided to the student. The Stipulations of Fact include similar information. However, Plaintiffs do not respond to these student case files, failing to systematically review the test results and other information for each student plaintiff. The two specific facts about Plaintiffs' performance to which Plaintiffs do point are Lizet Aranda and Omar Galindo's March 1995 test results on the ITBS. Their national percentile ranks based on their composite scores were in the fourth and first percentiles, respectively. While these test scores are certainly troubling, they cannot be evaluated in a vacuum. Plaintiffs do not attempt to compare these test results to FEP students at APS or to review the two students' records to identify the cause of the low scores. Given, for example, that Omar Galindo had numerous disciplinary problems and did show, based on improved LAS scores, increasing English proficiency while enrolled at APS, the Court cannot conclude based on one test score that APS has violated the EEOA.

Other courts ruling on EEOA claims have been careful not to overstep the role of the judiciary as to educational policy. *See, e.g., Keyes v. School Dist. No. 1*, 576 F.Supp. 1503, 1518 (D.Colo. 1983)(stating "[i]t is beyond the competence of the courts to determine appropriate measurements of academic achievement," and expressing concern about "damage to the fabric of federalism" when national courts dictate local educational policy). This Court similarly declines to impose its view of how a language remediation program should be structured, implemented, or evaluated. While federal courts are properly in the position of ensuring that students' right to equal educational opportunities are not trammeled upon, the courts must not prescribe their own standards, but rather must look to educational experts for guidance.

The Court finds that two elements required in the factual record of a case such as this, decided on the third prong of *Castañeda*, are: (1) the proper standard, based on accepted educational theory approved by some experts in the field, to apply in determining whether LEP students have overcome language barriers without experiencing setbacks in the core curriculum, and (2) facts indicating whether the school district has met this standard as to plaintiff students. Because, as all parties concede, no case has yet been decided based on the third prong, this is relatively unchartered territory. Plaintiffs offer the Court little guidance as to what standard would satisfy the EEOA's requirement of production of results. Plaintiffs do aver that to comply with the third prong, "a defendant must show evidence such as improved achievement tests, reduced repetition of grade levels, lower drop-out rates, and improved college entrance rates for both the LEP and non-LEP groups." *Plaintiffs' Memorandum in Support of Judgment*, at 9. However, this is not a precise enough standard for the Court to apply and is not supported by accepted educational theory. Moreover, Plaintiffs have failed to point to specific facts, other than two individual test results,

indicating that plaintiff students have not adequately overcome language barriers. Again, this is because Plaintiffs rely on the lack of results as proof of an EEOA violation. However, this is insufficient. The third prong requires both that there be data and that the data indicate success. Because there is not sufficient data, the Court cannot assess whether the ALS program was sufficiently successful.

The Court finds that, under *Castañeda*, it is too soon to determine whether the APS's ALS program has adequately assisted LEP students in overcoming their language barriers when a proper evaluation system has not been in place for a sufficient time. In fact, APS is still implementing its system. Both the *Keyes* and *Castañeda* courts found it premature to assess whether a program had taken appropriate action to overcome language barriers until the school had implemented a proper system of testing and data collection. In *Castañeda*, the plaintiffs complained, *inter alia*, that the defendant school district violated the EEOA by failing to test LEP students in their native language to assess their progress in the curriculum. *Castañeda*, 648 F.2d at 1014. The Fifth Circuit held that such testing was important to ensure that LEP students not "incur irreparable academic deficits during this period." *Id.* The *Castañeda* court held that until the program's problems had been corrected and the required tests had been administered for sufficient time to assess their success, the court could not analyze whether the bilingual program had produced adequate results. *Id.* at 1014-15. Similarly, in *Keyes*, among the plaintiffs' claims was their allegation that the Denver Public Schools violated the EEOA by failing to test the students to measure the results of the program. *Keyes*, 576 F.Supp. at 1518. The court held that enacting proper assessment tools was part of the second-prong requirement of program implementation, stating, "[t]he lack of an adequate measurement of the effects of such service is a failure to take reasonable action to implement the transitional bilingual

policy." *Id.*

As in *Castañeda* and *Keyes*, in this case the Court cannot assess the ALS program until the new APS evaluation and data collection systems have been in place long enough to produce results to analyze. As Plaintiffs themselves assert, "Defendant's data is so lacking that no conclusion, summary or result can be made regarding the ALS program." *Plaintiffs' Memorandum in Support of Judgment*, at 16. Though the Court concurs with this statement based on its assessment of the facts, it cannot agree with Plaintiffs' conclusion that, "[t]herefore, Defendant fails the third prong of the *Castañeda* test and consequently, stands in violation of the EEOA." *Id.* Plaintiffs have made no showing and have not even alleged that APS's plans to develop a comprehensive data collection system by September 31, 2001 will be inadequate. Rather, they ask this Court to decide that since an adequate data collection system has not yet been adopted, the data must show that the ALS programs have failed. This is a logical jump the Court declines to make.

The Court recognizes a potential problem with its legal conclusions – the risk that schools with inadequate language remediation programs will avoid judicial scrutiny by intentionally failing to institute proper systems evaluating its programs, and therefore clarifies the breadth of its decision. The Court does not hold that in every case in which a school does not have an adequate system to measure the success of its language program, a court cannot reach decision whether the school has violated the EEOA. However, because in this case, the school district is in the process of implementing its evaluation and data collection systems, and the Plaintiffs have not presented sufficient proof that the defendant school district has not produced the results required by the EEOA, it would be premature to find that the school's language remediation program has failed to produce adequate results.

**THEREFORE,** the Court finds that Plaintiffs have not sustained their burden of proving a violation of the EEOA.

**IT IS ORDERED** that Plaintiffs' Memorandum in Support of Judgment for Plaintiffs on Count IV Based on Stipulated Facts **[Doc. No. 155]** is hereby DENIED.

_____
MARTHA VÁZQUEZ
U. S. DISTRICT JUDGE

Attorneys for Plaintiffs
Paul Adams
Brian J. Pangrle

Attorneys for Defendants
Arthur D. Melendres
George F. McFall
Elizabeth A. García

Attorneys for Intervenors
Roger L. Rice
Jane E. López
Toney Anaya
Antonio Anaya
Andrew Vallejos
Albert H. Kauffmann
Cynthia Cano
Xavier Maldonado
Nina Perales